1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PURUS PLASTICS GmbH,

                Petitioner,

v.

ECO-TERR DISTRIBUTING, INC.,

                Respondent.

Case No.: 2:18-cv-00277

**RESPONDENT ECO-TERR DISTRIBUTING, INC.'S MOTION TO DISMISS**

*Oral Argument Requested*

NOTE ON MOTION CALENDAR:
April 13, 2018

## I.      <u>MOTION TO DISMISS</u>

      Respondent Eco-Terr Distributing, Inc. ("Respondent" or "Eco-Terr") hereby moves to dismiss Petitioner Purus Plastics GmbH's ("Petitioner" or "Purus," and together with Eco-Terr, the "Parties") Petition to Confirm Foreign Arbitral Awards ("Petition") pursuant to 9 U.S.C. § 207, which gives this Court discretion to refuse to confirm a foreign arbitral award when certain conditions specified in the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") are present. *See* 9 U.S.C. § 207; *see also* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Art. V, New York, June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997 ("*New York Convention*"). Specifically, this Court should dismiss the Petition for the following reasons, which are grounds for refusing to enforce a

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

foreign arbitral award under the New York Convention: (1) the arbitral award at issue deals with a difference not contemplated by or falling within the terms of Purus' submission to arbitration and contains decisions on matters beyond the scope of Purus' arbitration petition; (2) the subject matter of the difference was not capable of settlement by arbitration under the laws of Germany; (3) the arbitral procedure in this case was not in accordance with the Parties' agreement; (4) the arbitral award has not yet become binding on the Parties; and (5) enforcement of the arbitral award would run afoul of United States public policy.  *See New York Convention*, Art. V.  This Motion to Dismiss ("Motion") is supported by the facts and authorities set forth below.

## II.    STATEMENT OF FACTS

Purus and Eco-Terr are both in the business of selling a plastic interlocking grid product. *Declaration of Charles Baker in Support of Respondent's Motion to Dismiss* ("*Baker Decl.*"), ¶ 3.  The grid is a ground underlayment product that is used to reinforce and stabilize surfaces such as grass, gravel, and soil to improve the stability and drainage of those surfaces for humans, animals, and vehicles.  *Id.*  Eco-Terr has successfully built a reputation and market in the United States through: (1) marketing its unique trademarks, HOOFGRID and STABILIGRID, dating as far back as 2005; and (2) the production of its own separate "Made in the United States" products from 2012 to the present.  *Id* ¶ 4.  Purus, on the other hand, markets and sells its branded product as ECORASTER (formerly ECOGRID).  *See* PURUS PLASTICS, http://www.purus-plastics.de/ (last visited Mar. 16, 2018).  Purus filed for the trademark ECORASTER with the United States Patent and Trademark Office ("USPTO") on July 1, 2008, and the registration was granted on September 8, 2009.  *Declaration of Dayna J. Christian in Support of Respondent's Motion to Dismiss* ("*Christian Decl.*"), ¶ 8, Ex. 1 at 30–31.

On April 9, 2008, Purus and Eco-Terr entered into a Distributorship Agreement (the "Agreement") wherein Purus granted to Eco-Terr the rights to distribute Purus' ECOGRID (later ECORASTER) product in the United States and Canada.  *Id.* ¶ 9, Ex. 2 at 3.  Under the

/ / /

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

1  Agreement, Eco-Terr had "the exclusive right to distribute" the Purus product using the brand

2  designations "HOOFGRID, STABILIGRID, or HOMEGRID." *Id.* at 9.

3        The Agreement was limited to only grant Eco-Terr the right to distribute Purus' product

4  in North America during the term of the Agreement, which ran from April 1, 2008 until

5  December 31, 2010 and then automatically renewed yearly until terminated. *Id.* at 14.  The only

6  product addressed in the Agreement was Purus' "Made in Germany" product, which was owned

7  and manufactured by Purus. *Baker Decl.* ¶ 5.  There was no collaboration among the Parties on

8  any new products or designs during the term of the Agreement; the collaboration was nothing

9  more than Eco-Terr selling the Purus product in the North American marketplace. *Id.* ¶ 6.  At no

10  time during the term of the Agreement did Eco-Terr have its own product, nor did it participate

11  in any manufacturing of a grid product or own any grid product designs. *Id.* ¶ 7.

12        Before the Parties entered into the Agreement, Eco-Terr had been successful in the

13  ground underlayment grid marketplace using its existing unregistered common law trademarks,

14  HOOFGRID and STABILIGRID, which it used to market other products for sale dating back as

15  far as 2005. *Id.* ¶ 4.  Because of that success and Eco-Terr's established presence in the North

16  American market, Purus was encouraged to allow Eco-Terr to sell its German-made product

17  using Eco-Terr's brands. *Id.* ¶ 5.  The Agreement addressed the use of those brands in Section

18  H and required Eco-Terr to "apply for registration of . . . [t]he design of the trademarks" of

19  HOOFGRID and STABILIGRID in the United States and Canada.  *Christian Decl.*, ¶ 9, Ex. 2 at

20  9.  The "design of the trademarks" were required to be "adapted to the design" of Purus'

21  trademarks for ECORASTER and ECOGRID. *Id.*  The applications were to be submitted

22  "within six months after signing" the Agreement. *Id.*

23        Because there were never any branded goods bearing the trademark HOOFGRID or

24  STABILIGRID offered for sale in interstate commerce in either the United States or Canada,

25  there could not be a truthful or valid application for a trademark registration in either country, as

26  more fully described herein. *Baker Decl.* ¶ 8.  Purus was always aware that Section H of the

Page 3 of 21 – RESPONDENT ECO-TERR DISTRIBUTING, INC.'S MOTION TO
DISMISS – CASE NO. 2:18-cv-00277

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

1    Agreement could not be fulfilled so long as Eco-Terr was only distributing Purus' trademarked

2    ECORASTER or ECOGRID product in North America.  *Id.* ¶ 9.

3         After just over three years, Purus chose to terminate the Agreement, notifying Eco-Terr

4    by a letter dated June 22, 2011 that the Agreement would end effective December 31, 2011.

5    *Christian Decl.* ¶ 10, Ex. 3.  In its letter, Purus raised no outstanding issues between the Parties,

6    made no assertion that Eco-Terr had in any way breached the Agreement, and did not indicate

7    that Eco-Terr was in any way responsible for Purus' decision to end the Agreement.  *See id.*

8    Rather, Purus indicated that its termination of the Agreement was due to the fact that it was

9    "currently reorganising [sic] its market presence in the United States of America and in Canada"

10   and would soon be establishing "a new affiliated company" to handle production and distribution

11   of Purus products in North America.  *Id.*

12        After the Agreement ended on December 31, 2011, Eco-Terr had no choice but to move

13   on and rebuild its business.  These rebuilding efforts included Eco-Terr's first effort to design

14   and manufacture its own product in the United States, which it intended to brand with its

15   common law trademarks, HOOFGRID and STABILIGRID.  *Baker Decl.*, ¶ 10.  Having goods

16   offered for sale in the United States and Canada that were imprinted with the Eco-Terr marks

17   would entitle Eco-Terr for the first time to truthfully and validly apply for trademark registration

18   of goods.  *Id.* ¶ 11.  Eco-Terr applied for United States and Canadian trademarks for the use of

19   HOOFGRID and STABILIGRID, which it intended to brand on the molded plastic of Eco-Terr's

20   own grid product that would be manufactured in the United States.  *Id.* ¶ 12. Eco-Terr submitted

21   its intent-to-use trademark applications to the USPTO on January 1, 2012 and to the Canadian

22   Intellectual Property Office ("CIPO") on January 11, 2012.  *Christian Decl.*, ¶ 11, Ex. 4; ¶ 12,

23   Ex. 5.  No objections to these applications were filed in either jurisdiction.  *Baker Decl.*, ¶ 13.

24   / / /

25   / / /

26   / / /

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

On October 19, 2012, Eco-Terr had succeeded in designing and manufacturing its first grid product and was entitled to submit proof of the trademarks molded into the plastic grid product manufactured in the United States, referred to as a "specimen." *Christian Decl.*, ¶ 13, Ex. 6;  ¶ 14, Ex. 7; ¶ 15, Ex. 8. The specimen provided proof of use of the trademarks branded on goods, referred to as a "Statement of Use."  The Statement of Use was accepted by the USPTO, and Eco-Terr's intent-to-use trademark was upgraded to an in-use trademark in the United States. *Baker Decl.*, ¶ 14.  The proof of Eco-Terr's new product being sold in interstate commerce entitled it to the USPTO registration that was issued on January 1, 2013, and the CIPO trademark registration that was issued on February 5, 2013.  *Christian Decl.*, ¶ 11, Ex. 4 at 6; ¶ 12, Ex. 5 at 6.

On May 8, 2013, Purus filed its Arbitration – Statement of Claim in Germany, and a panel of three arbitrators ("Arbitration Panel") was appointed to hear the case.  *Id.* ¶ 16, Ex. 9. Contrary to Eco-Terr's request, the Arbitration Panel conducted the arbitration proceedings in German, despite the fact that Eco-Terr did not speak or understand the German language.  *Baker Decl.*, ¶ 15.  At the center of the arbitration controversy were Eco-Terr's post-Agreement registered trademarks for its United States-made new product stamped with the marks HOOFGRID® and STABILIGRID®.  *See Christian Decl.*, ¶ 16, Ex. 9.  Specifically, Purus argued that: (1) Section H.7 of the 2008 Agreement required Eco-Terr to apply for registration of the marks for HOOFGRID and STABILIGRID with the USPTO and CIPO within six months of signing the Agreement; (2) the design of the trademarks was to match Purus' trademarks ECORASTER and ECOGRID, which required Purus' written approval before the application was submitted; and (3) assuming the trademark registrations were approved by the USPTO and CIPO, they were to be transferred to Purus pursuant to Section H.8 of the Agreement.  *See id.* at 2–3; *see also id.* ¶ 9, Ex. 2 at 9–10.

Throughout the arbitration proceedings in Germany, Eco-Terr argued that none of the provisions in Section H of the Agreement were capable of completion because Eco-Terr was

Page 5 of 21 – RESPONDENT ECO-TERR DISTRIBUTING, INC.'S MOTION TO DISMISS – CASE NO. 2:18-cv-00277

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

only distributing Purus' trademarked ECORASTER and ECOGRID product, and therefore the Section's purpose was impossible and frustrated; Eco-Terr further argued that this rendered Section H of the Agreement lapsed and terminated. *Id.* ¶ 3; *see id.* ¶ 8, Ex. 1 at 3; ¶ 17, Ex. 10 at 2; ¶ 18, Ex. 11 at 5–6 (Agreement Section L.10 stating that frustration of contract terms will result in a lapse of the contractual parties' obligations and automatically terminate the Agreement, and Section N.3 providing that other Agreement terms are not affected by the impracticability of one provision). Eco-Terr unequivocally demonstrated to the Arbitration Panel that its performance under Section H of the Agreement was impossible. Specifically, Eco-Terr presented the Arbitration Panel with an explanation of United States trademark laws, demonstrating that to register the HOOFGRID and STABILIGRID trademarks at the USPTO and CIPO in 2008 (when Section H was to be performed), Eco-Terr would have been required to present goods branded with the trademarks that could be submitted as a specimen to support a Statement of Use. *See* 15 U.S.C. § 1058(b)(1)(C) (requiring that an application shall include an affidavit that shall "be accompanied by such number of specimens or facsimiles showing current use of the mark in commerce"); R.S.C., 1985, c. T-13, s. 16; *see also Christian Decl.* ¶ 4; *see id.* ¶ 8, Ex. 1 at 3; ¶ 17, Ex. 10 at 2; ¶ 18, Ex. 11 at 5–6. Thus, neither the USPTO nor CIPO would grant registration for a trademark on goods that did not exist, and Eco-Terr was not distributing any goods that were branded as HOOFGRID or STABILIGRID because those products would not be invented until 2012, long after the Agreement was terminated by Purus. Eco-Terr presented the Arbitration Panel with clear proof that at no time during the Agreement—from April 1, 2008 to its end on December 31, 2011—was there ever a good branded with either trademark that could have been submitted to either the USPTO or CIPO to prove use of the trademark in interstate commerce and satisfy this registration requirement. *Id.* ¶ 4; ¶ 18, Ex. 11 at 5–6.

After years of litigation, the Arbitration Panel found in Purus' favor and submitted two arbitral awards. The first Arbitral Award ("Award") was dated September 8, 2015 and spanned

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

thirty-one pages.  *Id.* ¶ 19, Ex. 12 at 24.  The Award ultimately concluded that because Eco-Terr

was able to apply for and register word trademarks from the USPTO and CIPO after the

Agreement terminated, then certainly Eco-Terr could have obtained the Section H design

trademark registrations in 2008.  *Id.*  The Award included the following directives to Eco-Terr:

1.  Transfer to Purus the post-Agreement HOOFGRID® and STABILIGRID®
    trademark registrations in the United States and Canada;

2.  Refrain from use of the two trademarks;

3.  Turn over all distribution channel information for the trademarked goods to
    Purus;

4.  Pay Purus €20,000.00;

5.  Pay Purus for "all damage, which has arisen or will arise in the future" in
    connection with the failure to apply for the trademarks in 2008 and for use of the
    trademarks; and

6.  Pay Purus for the cost of the arbitration and mediation in an amount to be set.

*Id.* at 2–3.  The second Arbitral Award on Cost ("Cost Award") was dated October 14, 2015 and

awarded to Purus its costs and expenses totaling €111,449.48.  *Id.* ¶ 20, Ex. 13.  Eco-Terr

objected to both the Award and the Cost Award by letter dated January 22, 2016.[1]  *Id.* ¶ 21, Ex.

14.  The Arbitration Panel never responded to Eco-Terr's objections.  *Id.* ¶ 5.

### III.   ARGUMENT

**A.    Standard of Review**

     The New York Convention was the result of a global effort to make arbitration an

efficient and certain method of resolving international disputes.  Joseph T. McLaughlin and

Laurie Genevro, *Enforcement of Arbitral Awards Under the New York Convention – Practice in

U.S. Courts*, 3 Berkeley J. Int'l L. 249, 251 (1986).  The goal of the New York Convention, "and

the principal purpose underlying American adoption and implementation of it, was to encourage

the recognition and enforcement of commercial arbitration agreements in international contracts

---

[1] Eco-Terr objected to the costs awarded to Purus but does not argue here that the Cost Award
violates the New York Convention.

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone:  206-492-7531
Facsimile:  503-802-5351

and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974).

The New York Convention applies to arbitration awards made outside the jurisdiction where recognition and enforcement of such awards are sought. *New York Convention*, Art. I. It requires contracting states to "recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." *Id.* at Art. III. To have a foreign arbitral award recognized and enforced, the party applying for such enforcement must submit an application to the relevant court accompanied by the duly authenticated original award and original arbitration agreement (or duly certified copies thereof), along with a certified translation of those documents into the official language of the country where enforcement is sought, if applicable. *Id.* at Art. IV.

Courts in the United States typically recognize and enforce pursuant to the New York Convention awards rendered in foreign arbitrations. *See* 9 U.S.C. §§ 201, 207. With that said, United States courts also recognize and adhere to the New York Convention's seven grounds for refusal to recognize and/or enforce an arbitral award. 9 U.S.C. § 207. To that end, 9 U.S.C. § 207 provides:

> Within three years after an arbitral award falling under the [New York] Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention.

*Id.* In turn, the New York Convention provides that recognition and enforcement of an arbitral award may be refused if the party against whom it is invoked furnishes to the competent authority proof that:

> (a) The parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone:  206-492-7531
Facsimile:  503-802-5351

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

*New York Convention*, Art. V(1).  Enforcement may also be refused if "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of that country; or . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country."  *Id.* at Art. V(2).

**B.      This Court should refuse to recognize and enforce the Award in the United States because the arbitration proceedings and decision were flawed, and the Award runs afoul of the New York Convention.**

In the present case, the New York Convention applies to the Award because it was awarded in Germany, and Purus seeks to enforce it in the United States.  Because Purus petitioned for confirmation of the Award within three years of its making, this Court must recognize and enforce it unless Eco-Terr can prove that at least one of the above-listed grounds for refusal exists in this case.  However, because Eco-Terr can demonstrate the existence of several defenses to enforcement of the Award, this Court should refuse to recognize and enforce the Award pursuant to 9 U.S.C. § 207 and Article V of the New York Convention.

As fully detailed below, the arbitration proceedings and decision reached by the Arbitration Panel in Germany were flawed, and the Award runs afoul of the New York Convention in five ways.  First, the Award deals with differences not contemplated by or falling

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

1   within the terms of Purus' submission to arbitration and contains decisions on matters beyond the

2   scope of Purus' arbitration submission.  Second, the subject matter of the difference was not

3   capable of settlement by arbitration under the laws of Germany.  Third, the arbitral procedure

4   was not in accordance with the agreement of the Parties.  Fourth, the Award has not yet become

5   binding on the Parties.  Fifth and finally, this Court's recognition and/or enforcement of the

6   Award would be contrary to the public policy of the United States.  Each of these reasons could

7   alone justify this Court's refusal to recognize and enforce the Award.  When viewed together,

8   there can be little doubt that this Court should decline to recognize and enforce the Award in the

9   United States.

10          1.      **This Court should refuse to recognize and enforce the Award because it**
                    **improperly assigned Purus the rights to Eco-Terr's post-Agreement business**
11                  **endeavors, thereby dealing with a difference not contemplated by and**
                    **deciding matters beyond the scope of the Parties' arbitration submission.**
12

13          The New York Convention provides that recognition and enforcement of an arbitral

14   award may be refused where "[t]he award deals with a difference not contemplated by or not

15   falling within the terms of the submission to arbitration, or it contains decisions on matters

16   beyond the scope of the submission to arbitration."  *New York Convention*, Art. V(1)(c).  In

17   considering this defense to enforcement of an arbitral award, courts "examine whether the award

18   exceeds the scope of the [parties' arbitration agreement], not whether the award exceeds the

19   scope of the parties' pleadings."  *Ministry of Def. of the Islamic Republic of Iran v. Gould, Inc.*,

20   969 F.2d 764, 771 (9th Cir. 1992).  This defense "allow[s] a party to attack an award predicated

21   upon arbitration of a subject matter not within the agreement to submit to arbitration," in

22   recognition of the fact that "an award may not be enforced where predicated on a subject matter

23   outside the arbitrator's jurisdiction."  *Parsons & Whittemore Overseas Co., Inc. v. Societe*

24   *Generale de L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 976–77 (2d Cir. 1974).

25   / / /

26   / / /

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone:  206-492-7531
Facsimile:  503-802-5351

Here, the Award both deals with differences not contemplated by and contains decisions on matters beyond the scope of the Parties' agreement to arbitrate. The Agreement's mediation and arbitration provisions state:

> 5. In the event that the parties have differences of opinion over the performance or termination of this Agreement, the contracting parties shall undertake to settle such differences firstly by way of mediation based on the rules of procedure prevailing at the mediation centre [sic] of the Nuremberg Chamber of Industry and Commerce for Central Franconia (*Mediationszentrum der Industrie- und Handelskammer Nürnberg für Mittelfranken).*

> 6. In the event that the parties are unable to reach an agreement through such mediation, any party may require that arbitration proceedings be instituted – to the exclusion of ordinary courts – on the basis of the rules of arbitration for the standing arbitral tribunal of the Nuremberg Chamber of Industry and Commerce for Central Franconia (*Ständiges Kaufmännisches Schiedsgericht der Industrie- und Handelskammer Nürnberg für Mittelfranken*). The decision of the arbitral tribunal shall be final and binding.

*Christian Decl.*, ¶ 9, Ex. 2 at 19. Thus, all arbitrations between the Parties were limited to disputes arising from "differences of opinion over the performance or termination of [the] Agreement." *See id.* Because the Agreement's term ran from April 1, 2008 through December 31, 2011, the Parties' agreement to arbitrate disputes pertaining to the performance or termination of the Agreement only applied to events occurring during that contract period. *See id.* ¶ 9, Ex. 2 at 14.

It is without question that the Arbitration Panel dealt with a matter not contemplated by the Parties' arbitration submission, and the Award exceeds the scope of the Parties' agreement to arbitrate. Rather than addressing a specific provision of the Agreement and resolving differences arising from the performance or termination thereof, the Arbitration Panel considered post-Agreement events occurring from 2012 to the present and awarded to Purus the benefit of Eco-Terr's trademark application, product development, and manufacturing actions that were taken *after* the Agreement ended and were in no way related to the Agreement. As fully detailed above, Eco-Terr did not take any actions with regard to the trademarks at issue until January 1,

Page 11 of 21 – RESPONDENT ECO-TERR DISTRIBUTING, INC.'S MOTION TO DISMISS – CASE NO. 2:18-cv-00277

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

2012, after the Agreement was terminated by Purus.  These post-Agreement actions were not subject to arbitration in Germany, as they were unquestionably outside the scope of the Parties' agreement to arbitrate disputes arising from the Agreement during the contract term.  The Arbitration Panel had no authority to address or award rights with regard to any actions by Eco-Terr outside the four corners of the Agreement.  The Arbitration Panel exceeded the arbitration agreement when it opined that Eco-Terr's 2012 business efforts to design, manufacture, and offer for sale a new United States-made product, which entitled Eco-Terr to trademark registrations, were efforts that fit within the 2008–2011 Agreement and entitled Purus to obtain ownership of the trademarks and the sales channel data for the new United States-made product.

The Arbitration Panel also exceeded the scope of the arbitration agreement because the Award granted Purus ownership of Eco-Terr's "word" trademark registrations when the Agreement only addressed "design" trademarks, as described above. *Id.* ¶ 9, Ex. 2 at 9–10. Likewise, the Agreement pertained only to the German-made, Purus-owned products ECORASTER and ECOGRID and did not apply to any United States-made products invented by Eco-Terr after the end of the Agreement. *Id.* at 3.

Thus, the Award exceeded and contained decisions on matters beyond the scope of the Parties' agreement to arbitrate disputes arising within the performance and termination of the 2008–2011 Agreement.  It is therefore unenforceable and should not be recognized or enforced by this Court.

**2. This Court should refuse to recognize and enforce the Award because the issues of United States and Canadian trademark law raised therein are not capable of settlement by arbitration under the laws of Germany.**

Under the New York Convention, a court may refuse to recognize and enforce an arbitral award if "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of" the country where recognition and enforcement is sought. *New York Convention*, Art. V(2)(a).  When read together with related provisions of the New York Convention, this

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

defense to enforcement of an arbitral award is intended "to relieve the parties from having to proceed through a futile arbitration in which the resulting award would be unenforceable" because another authority has exclusive jurisdiction in such matters. *Corcoran v. Ardra Ins. Co., Ltd.*, 567 N.E.2d 969, 973 (N.Y. 1990). As relevant to this case, the United States and Canada have exclusive jurisdiction over trademark issues arising under their laws. *See Paleteria la Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 69 F. Supp. 3d 175, 201 (D. D.C. 2014) ("It also is a basic tenet of American trademark law that foreign use of a mark creates no cognizable right to use that mark within the United States. . . . This is known as the 'territoriality principle,' through which 'trademark rights exist in each country solely according to that country's statutory scheme.'" (internal citations omitted)).

Here, as Eco-Terr argued before the Arbitration Panel, the subject matter of the difference—Eco-Terr's post-Agreement United States and Canadian trademarks—was not capable of settlement by arbitration under the laws of Germany, and the Arbitration Panel improperly assigned German law to matters exclusively governed by United States and Canadian trademark laws. *Id.*, ¶ 22, Ex. 15 at 1–2. As fully detailed above, the trademarks at issue in this case were issued for branded goods that were designed and manufactured in the United States starting in 2012, a year after the Parties' Agreement had terminated. Thus, these trademarks were governed by United States and Canadian law, were not subject to the Agreement's German arbitration provision, and were not subject to German law.

While it is true that the Parties selected German law to govern the Agreement, it is simply not the case that German law *or* the Agreement's arbitration provision applied to Eco-Terr's 2012 conduct or trademarks obtained after the Agreement was terminated in 2011. *See id.*, ¶ 9, Ex. 2 at 19–20. No German law applies to United States or Canadian trademarks or ownership of trademark rights, nor does any German law govern the circumstances under which an American company can use trademarks in the United States. Thus, the subject of the Arbitration Panel's Award in this case (Eco-Terr's business efforts beginning in 2012) was not capable of

Page 13 of 21 – RESPONDENT ECO-TERR DISTRIBUTING, INC.'S MOTION TO DISMISS – CASE NO. 2:18-cv-00277

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

settlement under the laws of Germany, and it directly follows that the Award applying German legal principles to United States and Canadian trademarks applied for in 2012 should not be enforced in the United States.

Further, the Arbitration Panel's Award is directly contrary to the applicable United States and Canadian laws.  The Arbitration Panel incorrectly concluded that because it was possible for Eco-Terr to apply for trademark registration in 2012, *after* the Agreement was terminated, it must also have been possible for Eco-Terr to do so *during* the Agreement term from 2008 through 2011.  *See id.* ¶ 19, Ex. 12 at 24.  However, the Arbitration Panel's assumption was legally incorrect under the applicable United States and Canadian laws, despite the fact that Eco-Terr provided the relevant laws on numerous occasions.  *Id.* ¶ 5.  As set forth in the relevant laws, registration of a trademark requires a product associated with the mark that the applicant intends to use in commerce, and that the applicant actually use the product in commerce within three years.  37 C.F.R. § 2.51; R.S.C., 1985, c. T-13, s. 45.  As of December 31, 2011—the day on which the Agreement ended—no such product existed, nor did Purus have any intention of creating such a product.  *Baker Decl.*, ¶ 16.  Such a product was not invented by Eco-Terr until after Purus terminated the Agreement and Eco-Terr was forced to reinvent its business plans.  *Id.* Thus, it would have been impossible for Eco-Terr to register the trademarks during the term of the Agreement.

On January 1, 2012, Eco-Terr was free to design, manufacture, and sell its own product; it in fact did so no earlier than March 21, 2012, as stated in its sworn statement of first use of the mark in commerce submitted in its United States registration.  *See Christian Decl.*, ¶ 13, Ex. 6; ¶ 14, Ex. 7.  For these reasons, it was contrary to United States and Canadian law to order Eco-Terr to assign post-Agreement trademark rights to Purus, who neither possessed any marked product nor had any sales of such marked products in commerce in the United States or Canada.

Finally, the Award is unenforceable as issued because it lacks full consideration of the practicality of complying with United States, Canadian, and German laws.  Eco-Terr cannot

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone:  206-492-7531
Facsimile:  503-802-5351

transfer its HOOFGRID and STABILIGRID trademarks to Purus without violating United States and Canadian trademark laws.  Under Canadian law, it is unlawful to use a trademark in a manner that is likely to "cause confusion," "pass off other goods," or "mislead the public." R.S.C., 1985, c. T-13, s. 7.  Under United States law, if a trademark is assigned to another party, that party must submit a "verified statement of use" swearing that the party is selling the marked good in commerce.  15 U.S.C. § 1060(a)(1); 15 U.S.C. § 1051(d).  Thus, If Eco-Terr were to assign the trademarks at issue to Purus as the Award dictates, Purus would own them unlawfully because it does not possess any goods marked with either trademark; Purus cannot swear under penalty of perjury that it is using the marks on goods sold in commerce because Purus has no goods bearing the mark.  Either Purus would be required to commit perjury and violate United States and Canadian trademark laws, or Purus would lose the right to the marks the minute it tried to assert ownership rights over the trademark.  Blocking the Award from registration in the United States would avoid this violation of United States and Canadian trademark laws on United States soil.

Issues of United States and Canadian trademark law are not capable of settlement by arbitration under the laws of Germany, and the assignment of Eco-Terr's trademarks for goods created, produced, and sold *after* the Agreement was terminated is not lawful under either United States or Canadian law.  Further, the Arbitration Panel's Award is directly contrary to the applicable United States and Canadian laws, and it is not possible for either Eco-Terr or Purus to legally comply with the Award.  Thus, this Court should refuse to recognize and enforce the Award in the United States.

3. **This Court should refuse to recognize and enforce the Award because the arbitral procedure was not conducted in accordance with the Parties' agreement to arbitrate.**

The New York Convention provides that a court may refuse to recognize and enforce an arbitral award if "[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance

Page 15 of 21 – RESPONDENT ECO-TERR DISTRIBUTING, INC.'S MOTION TO DISMISS – CASE NO. 2:18-cv-00277

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

with the law of the country where the arbitration took place." *New York Convention*, Art. V(1)(d).

Here, the arbitration procedure was not in accord with the Parties' reasonable expectations arising from their agreement to arbitrate, nor was it consistent with the course of conduct throughout their three-year business relationship. The Agreement does not specifically state which language would apply to an arbitration between the Parties. *See id.*, ¶ 9, Ex. 2 at 16–20. The Agreement specifies only that the German version of the Agreement is controlling, rather than the English translation. *Id.* at 20. However, throughout their more than three-year business relationship, the Parties negotiated and performed under the contract exclusively in English. *Baker Decl.*, ¶ 15. Purus was well-aware that Eco-Terr did not speak or understand German, and Purus was fluent in English. *Id.*

For these reasons, Eco-Terr reasonably expected that the arbitration between the Parties would be conducted in English. *Id.* Both Parties and the Arbitration Panel were fluent in English, with only Purus and the Arbitration Panel speaking German. *Id.* Eco-Terr was the only Party involved in this dispute that did not speak German. *Id.* Because Eco-Terr did not speak German, it asked the Arbitration Panel to use the English language during the course of the arbitration, as that language was familiar to all and had always been used by the Parties in their business communications. *Christian Decl.*, ¶ 8 Ex. 1 at 1; ¶ 21, Ex. 14 at 1–2 ; ¶ 23, Ex. 16 at 1. Despite Eco-Terr's reasonable request, the Arbitration Panel refused and elected to conduct the arbitration in German, requiring Eco-Terr to participate in the arbitration using only the German language. *Id.* ¶ 24, Ex. 17. This decision was contrary to the consistent course of conduct throughout the Parties' business relationship, and it severely impacted Eco-Terr's ability to participate fully in the arbitration process. *Id.* ¶ 7.

The Arbitration Panel's refusal to use a mutually understood language denied Eco-Terr of its right to due process during the arbitral proceedings. The Arbitration Panel's Order No. 8 declared that the Arbitration Panel would reject any submission that it found difficult to read and

Page 16 of 21 – RESPONDENT ECO-TERR DISTRIBUTING, INC.'S MOTION TO DISMISS – CASE NO. 2:18-cv-00277

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone:  206-492-7531
Facsimile:  503-802-5351

suggested that errors in translation were occurring.  Eco-Terr responded and offered to provide English versions of all submissions to avoid translation errors, to which the Arbitration Panel did not respond.  *Id.*, ¶ 18, Ex. 11 at 2–3.  However, Eco-Terr could never have known if its translated submissions were accurate or captured the intended meaning.  *Id.* ¶ 7.  Thus, Eco-Terr was denied due process in the arbitral procedure.  This was contrary to the Parties' Agreement and their shared expectations thereunder.  Accordingly, this Court should refuse to recognize and enforce the Award in the United States because the Award is the result of a violation of due process, a cornerstone of jurisprudence in the United States.

> ### 4.   This Court should refuse to enforce the Award because it has not yet become binding on the Parties.

The New York Convention provides that a court may refuse to recognize and enforce an arbitral award when it "has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."  *New York Convention*, Art. V(1)(e).

Here, the Award cannot be final and binding on the Parties because it contains elements that are not definite or enforceable in any meaningful way.  For example, the Award includes an undefined monetary award of "all damage, which has arisen or will arise in the future" that has never been evaluated or determined by the Arbitration Panel.  *See id.*, ¶ 19, Ex. 12 at 4.  The Parties have no means by which to calculate this amount, and the Arbitration Panel has never offered clarity regarding the exact amount awarded.  Perhaps this is because these damages are based upon hypothetical trademark registrations that were impossible in 2008 and could only be calculated by pure speculation.  Further, damages "arising in the future" could only be tied to earnings generated by Eco-Terr *after* it created a new United States-made product, a product to which Purus has no entitlement.  Thus, the Award is indefinite, has not yet been finalized, and cannot be currently binding on the Parties.

/ / /

Page 17 of 21 – RESPONDENT ECO-TERR DISTRIBUTING, INC.'S MOTION TO DISMISS – CASE NO. 2:18-cv-00277

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone:  206-492-7531
Facsimile:  503-802-5351

1  Further, the Arbitration Panel never addressed Eco-Terr's objections to the Award.  Each

2  of the arguments raised here in favor of disallowing the Award into the United States court

3  system was raised in Eco-Terr's objections to the Arbitration Panel.  *Id.*, ¶ 5; *id.* ¶  21, Ex. 14.

4  Eco-Terr tried repeatedly to help the Arbitration Panel understand the working of United States

5  and Canadian trademark laws and the difference between conduct *during* the term of the

6  Agreement and later conduct by Eco-Terr *after* the term of the Agreement.  *Id.*  These important

7  and dispositive issues have not been resolved by the Arbitration Panel, and Eco-Terr is entitled to

8  review of the Award.  *Id.*

9  For these reasons, the Award is not yet binding on the Parties, and it should not be

10  recognized or enforced by this Court.

11  **5.**  **This Court should refuse to recognize or enforce the Award because its enforcement would be contrary to the public policy of the United States.**

12  Finally, the New York Convention provides that a court may refuse to recognize or

13  enforce an arbitral award when "[t]he recognition or enforcement of the award would be contrary

14  to the public policy of [the] country [where enforcement is sought]."  *New York Convention*, Art.

15  V(2)(b).  The public policy exception applies where the enforcement of an arbitral award would

16  violate basic notions of morality and justice, for example if a party's due process rights have

17  been violated.  *Changzhou Amec E. Tools & Equip. Co., Ltd. v. E. Tools & Equip., Inc.*, No.

18  EDVC 11-00354 VAP, 2012 WL 3106620, at *11 (C.D. Cal. July 30, 2012).

19  Here, the Award should not be confirmed by this Court because it violates United States

20  public policy.  The German Arbitration Panel: (1) improperly penalized Eco-Terr for refraining

21  from filing false trademark applications; (2) misapplied United States and Canadian law,

22  resulting in an order for Eco-Terr to transfer validly obtained and owned trademarks to Purus,

23  which cannot legally own or maintain those trademarks; and (3) violated Eco-Terr's due process

24  rights.  For these reasons, as more fully argued below, this Court should refuse to recognize and

25  enforce the Award in the United States, and Purus' Petition should be denied.

26  / / /

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

1
2

**(a)     The Award improperly penalizes Eco-Terr for refraining from filing false and unlawful trademark applications.**

3       As previously noted, both United States and Canadian trademark law requires that an
4   applicant have a bona fide intention to use, or actually be using, the trademark applied for in
5   commerce.  15 U.S.C. § 1051(b); R.S.C., 1985, c. T-13, s. 30.  If the trademark is intended for
6   use, the applicant must submit an affidavit that, under penalty of perjury, swears that it will use
7   the marked product in commerce.  15 U.S.C. §1058(b)(1); R.S.C., 1985, c. T-13, s. 30.  Although
8   Eco-Terr acknowledges that the terms of the Agreement required it to seek registration within six
9   months, Eco-Terr was legally unable to do so because no bona fide intention to use the
10  trademarks on a marked product sold in commerce actually existed.  Purus knew or should have
11  known of this barrier because Purus at all times knew that Eco-Terr was selling *only* Purus'
12  product (ECORASTER), and not any product bearing the mark HOOFGRID or STABILIGRID.

13      At the time of the Agreement, there was no product marked with the trademark, and any
14  representation to the USPTO of a bona fide intent to use it would have been fraudulent and
15  illegal.  In other words, and contrary to the Arbitration Panel's finding, Eco-Terr could not have
16  complied with this Agreement term from the beginning.  Put simply, Purus did not supply Eco-
17  Terr with a product marked with the either the HOOFGRID or STABILIGRID trademarks;
18  instead, the Agreement was for Eco-Terr to sell Purus' product (marked with the trademark
19  ECORASTER) in the United States only.  It was only after termination of the Agreement, when
20  Eco-Terr developed and manufactured its own product marked with the trademarks, that it could
21  seek registration.  Prior to unilaterally terminating the Agreement, Purus did not seek to enforce
22  this provision and if it had, Eco-Terr would have been required to commit perjury.  Only after
23  Purus terminated the Agreement and realized that Eco-Terr was pursuing the manufacture and
24  sale of a competing product marked with the HOOFGRID and STABILIGRID marks did Purus
25  seek to persuade the Arbitration Panel to use Eco-Terr's post-Agreement business endeavors to
26  enforce the expired provision.

Page 19 of 21 – RESPONDENT ECO-TERR DISTRIBUTING, INC.'S MOTION TO
DISMISS – CASE NO. 2:18-cv-00277

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone:  206-492-7531
Facsimile:  503-802-5351

**(b)    The Award required Eco-Terr to take action that is inconsistent with both United States and Canadian trademark laws.**

The Award exceeded the scope of the Arbitration Panel's authority by, in effect, ordering Eco-Terr to give Purus its own intellectual property now associated with the HOOFGRID and STABILIGRID marks.  By registering the marks and associating them with Eco-Terr's own American-made products, the marks at issue are now inextricably linked to that product.

Any attempt to now associate HOOFGRID and STABILIGRID with Purus' products (already marked ECORASTER) would cause a likelihood of confusion to consumers as to the source of the goods.  Such a result not only violates the Lanham Act and the Canadian Trade-marks Act, but also violates the Madrid Protocol, to which both the United States and Germany are parties, because the trademark registrations are based upon those marks branded into Eco-Terr's product which prohibits others, including Purus, from using those marks on any goods other than the Eco-Terr product.  *See* 15 U.S.C. § 1051; R.S.C., 1985, c. T-13, s. 6.  If Eco-Terr did as the Arbitration Panel ordered, Purus would be left with trademarks wholly unenforceable under United States, Canadian, and German law and would violate the prohibition on passing off the goods of others as its own and/or creating confusion in the marketplace as to whose goods are affiliated with which trademarks.  Therefore, the Arbitration Panel's order for Eco-Terr to transfer the trademarks to Purus violates United States public policy.

**(c)    The Award fails to comport with United States due process guarantees and should not be recognized and enforced by this Court.**

Although enforcement of foreign arbitral awards is strongly encouraged under the New York Convention, awards that violate United States public policy may not be honored in the United States.  *New York Convention*, Art. V(2)(b).  When an award violates basic notions of morality and justice and runs "contrary to a well accepted and deep rooted public policy," then the award cannot be confirmed by a United States court.  *Changzhou Amec E. Tools & Equip. Co., Ltd.*, 2012 WL 3106620, at *19 (quoting *Diapulse Corp. of Am. v. Carba, Ltd.*, 626 F.2d

/ / /

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone: 206-492-7531
Facsimile: 503-802-5351

1108, 1110 (2d Cir. 1980)); *see also Mondis Tech. Ltd. v. Wistron Corp.*, No. 15-CV-02340 (RA), 2016 WL 6534255, at *4 (S.D. N.Y Nov. 3, 2016).

As argued above, the Award violates the most basic notions of morality and justice because it is the result of due process failures caused when Eco-Terr was prevented from meaningfully participating in the arbitration process due to a language barrier.  Further, the Award grants United States and Canadian trademark rights to Purus that Purus cannot lawfully possess in those countries because the trademark rights are inextricably tied to Eco-Terr's own United States-made product.  Because the trademarks cannot be separated from the goods without violating United States and Canadian law, the Award cannot be confirmed or enforced in the United States.  The Award is fatally flawed, and the United States' deeply-rooted public policy in favor of due process and enforcement of its own trademark rights cannot be preserved if the Award is confirmed.

## IV.    CONCLUSION

For the reasons set forth above, Respondent respectfully requests that this Court grant its Motion to Dismiss.

DATED: March 21, 2018

IMMIX LAW GROUP PC

By _____
Dayna J. Christian, WSBA #32459
Immix Law Group PC
701 5th Ave, Suite 4710
Seattle, WA 98104
Phone: (206) 492-7531
Fax: (503) 802-5351
E-Mail: dayna.christian@immixlaw.com

Attorneys for Eco-Terr Distributing, Inc.

Page 21 of 21 – RESPONDENT ECO-TERR DISTRIBUTING, INC.'S MOTION TO DISMISS – CASE NO. 2:18-cv-00277

Immix Law Group PC
701 5th Ave Suite 4710
Seattle, WA 98104
Telephone:  206-492-7531
Facsimile:  503-802-5351

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on March 21, 2018, I made arrangements to file the original of the

3

foregoing RESPONDENT ECO-TERR DISTRIBUTING INC.'S MOTION TO DISMISS with

4

the Clerk of the Court using the CM/ECF system, which will send notification of such filing to

5

the following:

6

**ATTORNEYS FOR PETITIONER PURUS PLASTICS GmbH**

7

James D. Nelson
Betts, Patterson & Mines, P.S.

8

One Convention Place, Suite 1400
701 Pike Street

9

Seattle, WA 98101-3927
Tel: 206-292-9988

10

Fax: 206-343-7053
Email: Jnelson@bpmlaw.com

11

12

Attorneys for Petitioner

13

IMMIX LAW GROUP PC

14

15

16

By _____

17

Dayna J. Christian, WSBA #32459

18

Immix Law Group PC
701 5th Ave, Suite 4710

19

Seattle, WA 98104
Phone: (206) 492-7531

20

Fax: (503) 802-5351
E-Mail: dayna.christian@immixlaw.com

21

22

Attorneys for Eco-Terr Distributing, Inc.

23

24

25

26